IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TELISA DE'ANN BLACKMAN,        §
                               §
            Petitioner,        §
                               §
V.                             §            No. 3:13-cv-2073-P-BN
                               §
WILLIAM STEPHENS, Director     §
Texas Department of Criminal Justice  §
Correctional Institutions Division,   §
                               §
            Respondent.        §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Petitioner Telisa De'ann Blackman, a Texas prisoner currently proceeding *pro se*, has filed an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See generally* Dkt. No. 1. Her petition has been referred to the undersigned United States magistrate judge pursuant to 28 U.S.C. § 636(b). The undersigned concludes that Petitioner's application is successive within the meaning of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and, as such, should be transferred to the United States Court of Appeals for the Fifth Circuit for appropriate action.

**Background**

Petitioner was charged by indictment with the June 22, 2007 murder of Lisa Davis, her roommate with whom she was also romantically involved. Petitioner pleaded not guilty, proceeded to trial by jury, and was found guilty on September 30, 1998. She was sentenced to life imprisonment.

Petitioner timely appealed, the Dallas Court of Appeals affirmed her conviction, *see generally Blackman v. State*, No. 05-98-01750-CR, 2000 WL 567985 (Tex. App. – Dallas May 8, 2000), and her petition for discretionary review was refused by the Texas Court of Criminal Appeals ("Court of Criminal Appeals"), *see Blackman v. State*, PDR No. 1293-00 (Tex. Crim. App. Nov. 22, 2000).

Below are the facts of this case as heard at Petitioner's trial as summarized by the Dallas Court of Appeals:

> [Petitioner] and the decedent, Lisa Davis, lived together in a lesbian relationship. One of the decedent's friends testified that the relationship was somewhat stormy and that, shortly before her death, the decedent wanted to end the relationship with [Petitioner], although she was apprehensive about doing so.
>
> The couple lived in a second-floor apartment, accessible by an outdoor stairway to a balcony in front of the apartment. [Petitioner] testified that, on Sunday evening, June 22, 1997, she left the apartment complex to go to a nearby convenience store, Quick Way. Upon returning, she realized she did not have her apartment key or her pass card to the apartment complex; she would have to ring the buzzer to be let into the complex. She went to the entryway of the apartment complex and, while she was standing on the sidewalk before going upstairs, she saw the decedent's feet lying on the balcony in front of their apartment. The apartment door was open, and the body was lying partially inside the apartment and partially outside. Decedent had been shot. [Petitioner] called the decedent's name, and eventually touched the decedent, but the decedent did not respond. [Petitioner] pulled the decedent's body inside their apartment. In doing so, she moved the decedent's feet to the side, to get them inside the apartment. She then shut the door and dialed 911. As a result of dragging the decedent's body inside the apartment complex, she got blood on her socks and shoes.
>
> Cathy Harding, a Dallas police detective, searched [Petitioner] in the homicide office at police headquarters because the only officers called to the crime scene were male; it was against department policy to have a male officer search a female suspect. Harding found blood on the soles of [Petitioner]'s socks. [Petitioner] told Harding that she had not taken her

-2-

shoes off that evening.

When Daniel Krieter, a Dallas police investigator, arrived at the murder scene, [Petitioner] asked him if he remembered her from an incident that had occurred about a year earlier. [Petitioner] had been shot by a gun, a .25 caliber Lorcin, that she owned. When the police closed their investigation into that incident, [Petitioner] reclaimed the gun from the department's property room. [Petitioner] testified at trial that the gun was stolen some two months after she had reclaimed it in August 1995. She did not report it as stolen, however, because it was not registered. [Petitioner] consistently denied that she had a gun on the night of the murder.

No gun was found; however, Krieter's search of the apartment revealed some spent shell casings on the floor and some live shell casings in a bureau drawer. The casings were .25 caliber and would fit a Lorcin. [Petitioner] and the decedent had moved into the apartment only some thirty days before the decedent's death. [Petitioner] explained that she moved in such haste she did not have time to throw out the live shell casings so she simply moved them.

Robert L. Ermatinger, a Dallas police homicide investigator, questioned [Petitioner] at the scene. [Petitioner] told him she had gone to "the store" when the shooting occurred, although she could not say which store. When pressed, [Petitioner] said she realized while enroute to the store she had forgotten her gate key and returned to the complex rather than going on to the store. When Ermatinger asked [Petitioner] at the scene if "they were a couple," that is, whether [Petitioner] and the decedent had a lesbian relationship, [Petitioner] said "they were not."

Finally, Cherissa Adams, a neighbor who lived on the first floor, testified that, on the evening of June 22, 1997, she heard a loud noise that sounded like gunfire. She looked out her window and saw a lifeless body. A young, thin girl was trying to move the body. The body's upper portion was inside an apartment. After Adams called 911, she returned to the window and continued to look out. The person who had moved the body locked the door and went downstairs. When the person looked in Adams's direction, Adams closed the blinds and moved away from the window. Adams had never seen the person before that evening and never saw her again. Adams was not able to identify appellant in court; at 11:35 p.m. on the night of the shooting, however, Adams did identify [Petitioner] in a photographic lineup.

2000 WL 567985, at *1-*2.

Petitioner filed her first state habeas application on January 16, 2002, *see Ex parte Blackman*, No. 52,123-01, and her writ was denied by the Court of Criminal Appeals on April 24, 2002. She filed her first federal habeas application in this Court on July 19, 2002. *See generally Blackman v. Cockrell*, No. 3-02-CV-1559-G, 2003 WL 21782254 (N.D. Tex. Apr. 18, 2003). This Court denied that application because it was barred by limitations. *See id.* at *2-*3. And this Court also denied a second federal habeas application filed by Petitioner for the same reason. *See generally Blackman v. Dretke*, No. 3-04-CV-1834-P, 2004 WL 2173444 (N.D. Tex. Sept. 8, 2004), *rec. adopted*, 2004 WL 2468819 (N.D. Tex. Nov. 2, 2004).

Petitioner filed her second state habeas application on October 10, 2005, *see Ex parte Blackman*, No. 52-123-02, and that writ was denied by the Court of Criminal Appeals on March 1, 2006.

Petitioner, represented by counsel, filed a third state habeas application on December 17, 2010. *See Ex parte Blackman*, No. 52,123-03.

This application was filed after the Dallas County District Attorney's Office granted Petitioner's counsel access to its file on August 27, 2009. *See* Dkt. No. 13-24 at 112, ¶ 25 (state-habeas trial court findings of fact and conclusions of law). Once Petitioner's counsel had access to the District Attorney's file, Petitioner's counsel discovered notes from the prosecutor – never turned over to defense counsel – indicating that Ms. Adams had told the prosecutor, in an interview one month prior to trial, "that Ms. Adams picked someone else out of the line up first and then changed

-4-

her mind and selected [Petitioner]." *Id.* at 110-11, ¶¶ 15, 16.

In addition to the notes, Petitioner's counsel also obtained a cassette recording

of the 911 call that Ms. Adams made on the day of Lisa Davis's killing.

> Ms. Adams told the 911 operator that she thought she heard a gunshot
> in her apartment complex, which causes her to look out of the window of
> her apartment, located on the ground floor of the complex, towards
> another apartment in the complex. Ms. Adams told the 911 operator that
> she saw a man lying down in the doorway and a black man that pushed
> him inside the apartment and closed the door. She told the operator that
> she could look out her window and see straight up into the apartment
> where the events occurred.

*Id.* at 108, ¶ 1.

As to the discovery of the 911 recording, the state-habeas trial court found the

following:

> After [Petitioner]'s [third] writ application was filed, Assistant District
> Attorney Christine Womble contacted Detective Ermatinger, who was the
> lead detective on the case against [Petitioner]. Ms. Womble asked Mr.
> Ermatinger to retrieve the Dallas Police Department file so Ms. Womble
> could compare it to the District Attorney's file to see if there was anything
> that the D.A.'s office did not have. Ms. Womble searched through the
> Dallas Police Department file and found a cassette tape that had a
> recording of Ms. Adams' 911 call. The cassette recording was copied and
> promptly provided to [Petitioner]'s counsel, J. Craig Jett, in 2011, prior
> to the hearing on [Petitioner]'s [third] Application for Writ of Habeas
> Corpus. The 911 recording was admitted into evidence at the writ hearing
> ... without objection by the State.

*Id.* at 112, ¶ 24; *see also id.* at 111, ¶ 18 ("The recording of Ms. Adams talking to the

911 operator was preserved by the Dallas Police Department. Ms. Kemp[, the

prosecutor,] was aware of the existence of the 911 recording and was aware that Ms.

Adams said on the recording that she saw a black male moving the body. Ms. Kemp did

not inform defense counsel, James Belt, about the existence of the 911 call or its

content. Mr. Belt was unaware of the existence of the 911 recording and its content at the time of the trial of [Petitioner]'s case and did not learn of the 911 recording and its content until they were provided to him by [Mr. Jett] in 2011." (internal record citations omitted)).

On July 3, 2012, the state-habeas trial court, after the benefit of an evidentiary hearing, found that both the prosecutor's notes concerning her meeting with Ms. Adams one month prior to trial and the 911 recording were favorable evidence that was suppressed by the State and was material. *See generally* Dkt. No. 13-24 at 108-16. That court recommended that relief be granted to Petitioner by vacating her conviction and remanding her case for a new trial. *See id.* at 116. The Court of Criminal Appeals disagreed and found that Petitioner failed to show that the suppressed evidence was material:

> Blackman first complains that the State withheld the recording of Adams's 911 call the night of the murder, during which she reported seeing a black man move a lifeless body. Blackman is female. Blackman's second claim regarding Adams's identification of Blackman from the photographic lineup on the night of the murder stems from a note in the prosecution's case file relating to a conversation with Adams about the identification. The note reads, in part, "[p]icked out someone else first, then changed mind [and] selected [Blackman] (Bust photo)." Blackman contends, and trial counsel confirmed at the writ hearing, that if the prosecution had disclosed this evidence, the defense could have used it to impeach Adams's testimony at trial that she saw Blackman drag a body into her apartment and might have followed a different investigative trail. Counsel also stated that, had he known this information, he would not have called Blackman as a witness and the jury would not have heard her testify about dragging the victim into her apartment.
>
> With regard to the investigative value of this withheld evidence, Blackman fails to identify what, if anything, this might have unearthed that would have sufficiently undermined confidence in the outcome at

trial. Similarly, she fails to show how impeaching Adams would probably have affected the results of the proceedings, particularly given the fact that – as Blackman concedes in her memorandum in support of her application – at least one officer testified at trial that Blackman admitted to dragging the victim into her apartment. Finally, Blackman makes no showing that the outcome would probably have been different had she chosen not to testify. Relief is denied.

*Ex parte Blackman*, No. WR-52,123-03, 2012 WL 4834113, at *1-*2 (Tex. Crim. App. Oct. 10, 2012) (per curiam). The order notes that Justices Meyers, Womack, and Johnson "would grant relief." *Ex parte Blackman*, 2012 WL 4834113.

In the habeas application now before this Court, Petitioner raises four grounds for relief. The first and second are that the prosecutor withheld two items of exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); the third is that the State violated due process by knowingly using, or failing to correct, false testimony; and the fourth is that she is actually innocent.

### Legal Standards and Analysis

AEDPA limits the circumstances under which a state prisoner may file a "second or successive" application for federal habeas relief, *see generally* 28 U.S.C. § 2244, and "was enacted in part to bring finality to state court judgments," *Leal Garcia v. Quarterman*, 573 F.3d 214, 220 (5th Cir. 2009) (citing *Williams v. Taylor*, 529 U.S. 420, 436 (2000)).

As the Fifth Circuit has explained,

Section 2244 lays out the requirements for filing successive petitions, serving as gate-keeper by preventing the repeated filing of habeas petitions that attack the prisoner's underlying conviction. The statute does not define "second or successive," however, and we have made clear that a petition is not "second or successive" merely because it is

numerically second. In *In re Cain*,[137 F.3d 234, 235 (5th Cir. 1998),] we defined a "second or successive" petition as one that "1) raises a claim challenging the petitioner's conviction or sentence that was or could have been raised in an earlier petition; or 2) otherwise constitutes an abuse of the writ." Section 2244 specifies when a later-in-time petition will be heard. Despite its strictures, the case law clarifies that there is a category of petitions that, even though later in time, are outside the confines of § 2244 and will be heard because they are not "second or successive" within the meaning of AEDPA.

*Id.* (footnotes omitted).

Respondent has chosen to defend against Petitioner's claims on the merits. *See generally* Dkt. No. 19; *see also id.* at 6-7 (asserting but failing to develop "the complicated intricacies of the timebar issue at this time"). While Respondent does not raise whether the petition now before the Court – Petitioner's third federal habeas application – should be considered successive within the meaning of AEDPA, the Court must answer that question to determine whether there is subject matter jurisdiction. *See Leal Garcia*, 573 F.3d at 219 ("AEDPA requires a prisoner to obtain authorization from the federal appellate court in his circuit before he may file a 'second or successive' petition for relief in federal district court. Without such authorization, the otherwise-cognizant district court has no jurisdiction to entertain a successive § 2254 petition." But "the stringent requirements of § 2244 for obtaining authorization [do] not apply" if the petition is not truly "second or successive." (footnotes omitted)).

Claims presented in a "second or successive" application under Section 2254 must be dismissed unless:

(A)     the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (B)  (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). That determination must be made by a three-judge panel of the Court of Appeals before Petitioner files his application in federal district court. *See id.* § 2244(b)(3).

In *Leal Garcia*, the Fifth Circuit remarked that a numerically subsequent petitions attacking the same conviction but "based on newly discovered *evidence*" – like Petitioner's third federal habeas application here – is nevertheless successive because "Section 2244(b)(2)(B)(i) states that claims based on a *factual* predicate not previously discoverable are successive." 573 F.3d at 221 (emphasis in original).

> Later habeas petitions attacking the same judgment that was attacked in a prior petition tend to be labeled successive and must meet the standards for authorization under § 2244. In contrast, later habeas petitions attacking distinct judgments, administration of an inmate's sentence, a defective habeas proceeding itself, or some other species of legal error – when the error arises after the underlying conviction – tend to be deemed non-successive. In essence, if the purported defect existed, or the claim was ripe, at the time of the prior petition, the later petition is likely to be held successive even if the legal basis for the attack was not. If, however, the purported defect did not arise, or the claim did not ripen, until after the conclusion of the previous petition, the later petition based on that defect may be non-successive.

*Id.* at 222 (footnotes omitted).

It could be argued that Petitioner could not have raised the claims related to

suppressed evidence when she filed her earlier federal petitions in 2002 and 2004 since she did not know she had such claims – because, until 2008, the Dallas County District Attorney's Office did not have an open file policy as to habeas writs. *See* Dkt. No. 2-1 at 2-2 (affidavit of J. Craig Jett); Dkt. No. 2-1 at 19 (affidavit of Gary A. Udashen) (also explaining that, "[p]rior to the fall of 2008, when the District Attorney's Office instituted this open file policy on writs, the District Attorney's Office did not allow defense counsel to review District Attorney's files on cases when an Application for Writ of Habeas Corpus was filed or being investigated. This was certainly true prior to Craig Watkins becoming District Attorney in 2007.").

But, even if the Court accepted this argument, this petition is nevertheless successive because the claims therein are "based on facts that were merely undiscoverable." *Stewart v. United States*, 646 F.3d 856, 863 (11th Cir. 2011) (applying *Leal Garcia* to find that, there, the numerically second federal habeas petition fell "within what the Fifth Circuit recognized is a small subset of unavailable claims that must not be categorized as successive.... [There,] the facts indicating there might be flaws in Stewart's Georgia convictions existed in 2004[, when he filed his first federal habeas petition,] but the *basis* for [the claim presented in numerically second federal habeas petition] – [an] order vacating [certain] predicate convictions – did not exist until July 2, 2008." (emphasis in original)); *see Crawford v. Minnesota*, 698 F.3d 1086, 1089, 1091 (8th Cir. 2012) (affirming the district court's conclusion that because petitioner's second application was successive, "preauthorization is required for *Brady* claims" and noting the district court "did not want to 'encourage misbehavior' by

prosecutors or other state actors[, but i]n the end it concluded that AEDPA's preauthorization procedures provide Crawford with federal review of his claim"). Here, under *Leal Garcia*, Petitioner's claims raised in her third federal habeas application attack purported defects that existed or claims that were ripe at the time of the prior applications even though Petitioner claims that the evidence to support and identify those claims was not previously discovered or discoverable. *See Leal Garcia*, 573 F.3d at 221-22.

## Recommendation

Petitioner's application for writ of habeas corpus should be transferred to the United States Court of Appeals for the Fifth Circuit for appropriate action.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or

adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: January 27, 2015

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE