IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TELISA DE'ANN BLACKMAN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | No. 3:13-cv-2073-P-BN |
| | § | |
| WILLIAM STEPHENS, Director | § | |
| Texas Department of Criminal Justice | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

With the Court's leave, Petitioner Telisa De'ann Blackman, a Texas prisoner,

has filed a second amended application for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, raising three claims: that the prosecution withheld exculpatory and

material evidence; that the prosecution used false and misleading testimony at her

trial; and that she is legally innocent under *Schulp v. Delo*, 513 U.S. 298 (1995). *See*

Dkt. No. 54. Chief Judge Jorge A. Solis has referred this habeas action to the

undersigned United States magistrate judge for pretrial management pursuant to 28

U.S.C. § 636(b) and a standing order of reference. *See* Dkt. No. 47.

Respondent has moved to dismiss Blackman's operative habeas application (or

most claims contained in that application) on the basis of limitations. *See* Dkt. Nos. 45

& 64. Because, after excluding the time during which the limitations period was tolled

while Blackman pursued state post-conviction relief related to her current claims,

Blackman filed this action within one year from the time that the factual predicates for her current claims could have been discovered through the exercise of due diligence, the undersigned issues these findings of facts, conclusions of law, and recommendation that the Court should deny the motion to dismiss.

## Applicable Background

Blackman was charged by indictment with the June 22, 2007 murder of Lisa Davis, her roommate, with whom Blackman was also romantically involved. Blackman pleaded not guilty, proceeded to trial by jury, and was found guilty on September 30, 1998. She was sentenced to life imprisonment. Her sentence was affirmed on direct appeal, and the Texas Court of Criminal Appeals ("TCCA") refused her petition for discretionary review. She also has filed numerous state and federal applications for writs of habeas corpus.

Before discussing the history of this – Blackman's third – federal habeas action, these are the facts as heard at Blackman's trial and summarized by the Dallas Court of Appeals:

> [Blackman] and the decedent, Lisa Davis, lived together in a lesbian relationship. One of the decedent's friends testified that the relationship was somewhat stormy and that, shortly before her death, the decedent wanted to end the relationship with [Blackman], although she was apprehensive about doing so.
>
> The couple lived in a second-floor apartment, accessible by an outdoor stairway to a balcony in front of the apartment. [Petitioner] testified that, on Sunday evening, June 22, 1997, she left the apartment complex to go to a nearby convenience store, Quick Way. Upon returning, she realized she did not have her apartment key or her pass card to the apartment complex; she would have to ring the buzzer to be let into the complex. She went to the entryway of the apartment complex and, while she was

standing on the sidewalk before going upstairs, she saw the decedent's feet lying on the balcony in front of their apartment. The apartment door was open, and the body was lying partially inside the apartment and partially outside. Decedent had been shot. [Petitioner] called the decedent's name, and eventually touched the decedent, but the decedent did not respond. [Petitioner] pulled the decedent's body inside their apartment. In doing so, she moved the decedent's feet to the side, to get them inside the apartment. She then shut the door and dialed 911. As a result of dragging the decedent's body inside the apartment complex, she got blood on her socks and shoes.

Cathy Harding, a Dallas police detective, searched [Petitioner] in the homicide office at police headquarters because the only officers called to the crime scene were male; it was against department policy to have a male officer search a female suspect. Harding found blood on the soles of [Petitioner]'s socks. [Petitioner] told Harding that she had not taken her shoes off that evening.

When Daniel Krieter, a Dallas police investigator, arrived at the murder scene, [Petitioner] asked him if he remembered her from an incident that had occurred about a year earlier. [Petitioner] had been shot by a gun, a .25 caliber Lorcin, that she owned. When the police closed their investigation into that incident, [Petitioner] reclaimed the gun from the department's property room. [Petitioner] testified at trial that the gun was stolen some two months after she had reclaimed it in August 1995. She did not report it as stolen, however, because it was not registered. [Petitioner] consistently denied that she had a gun on the night of the murder.

No gun was found; however, Krieter's search of the apartment revealed some spent shell casings on the floor and some live shell casings in a bureau drawer. The casings were .25 caliber and would fit a Lorcin. [Petitioner] and the decedent had moved into the apartment only some thirty days before the decedent's death. [Petitioner] explained that she moved in such haste she did not have time to throw out the live shell casings so she simply moved them.

Robert L. Ermatinger, a Dallas police homicide investigator, questioned [Petitioner] at the scene. [Petitioner] told him she had gone to "the store" when the shooting occurred, although she could not say which store. When pressed, [Petitioner] said she realized while enroute to the store she had forgotten her gate key and returned to the complex rather than going on to the store. When Ermatinger asked [Petitioner] at the scene if

"they were a couple," that is, whether [Petitioner] and the decedent had a lesbian relationship, [Petitioner] said "they were not."

Finally, Cherissa Adams, a neighbor who lived on the first floor, testified that, on the evening of June 22, 1997, she heard a loud noise that sounded like gunfire. She looked out her window and saw a lifeless body. A young, thin girl was trying to move the body. The body's upper portion was inside an apartment. After Adams called 911, she returned to the window and continued to look out. The person who had moved the body locked the door and went downstairs. When the person looked in Adams's direction, Adams closed the blinds and moved away from the window. Adams had never seen the person before that evening and never saw her again. Adams was not able to identify appellant in court; at 11:35 p.m. on the night of the shooting, however, Adams did identify [Petitioner] in a photographic lineup.

*Blackman v. State*, No. 05-98-01750-CR, 2000 WL 567985, at *1-*2 (Tex. App. – Dallas May 8, 2000).

The current federal habeas action results from Blackman's third state habeas application, filed on December 17, 2010, *see Ex parte Blackman*, No. 52,123-03, after the Dallas County District Attorney's Office (the "D.A.") granted her current habeas counsel, J. Craig Jett, access to its case file on August 27, 2009. *See* Dkt. No. 13-24 at 112, ¶ 25 (state-habeas trial court findings of fact and conclusions of law). Once Mr. Jett had access to the D.A.'s case file, he discovered notes from the prosecutor – which, it was later established, were never turned over to defense counsel – indicating that Ms. Adams had told the prosecutor, in an interview one month prior to trial, "that [she] picked someone else out of the line up first and then changed her mind and selected [Blackman]." *Id.* at 110-11, ¶¶ 15, 16.

In addition to the notes, the D.A. later provided Blackman a cassette recording of the 911 call Ms. Adams made the day of the murder.

-4-

> Ms. Adams told the 911 operator that she thought she heard a gunshot in her apartment complex, which causes her to look out of the window of her apartment, located on the ground floor of the complex, towards another apartment in the complex. Ms. Adams told the 911 operator that she saw a man lying down in the doorway and a black man that pushed him inside the apartment and closed the door. She told the operator that she could look out her window and see straight up into the apartment where the events occurred.

*Id.* at 108, ¶ 1. As to the discovery of the 911 recording, the state-habeas trial court found the following:

> After [Blackman]'s [third] writ application was filed, Assistant District Attorney Christine Womble contacted Detective Ermatinger, who was the lead detective on the case against [Blackman]. Ms. Womble asked Mr. Ermatinger to retrieve the Dallas Police Department file so Ms. Womble could compare it to the District Attorney's file to see if there was anything that the D.A.'s office did not have. Ms. Womble searched through the Dallas Police Department file and found a cassette tape that had a recording of Ms. Adams' 911 call. The cassette recording was copied and promptly provided to [Blackman]'s counsel, J. Craig Jett, in 2011, prior to the hearing on [Blackman]'s [third] Application for Writ of Habeas Corpus. The 911 recording was admitted into evidence at the writ hearing ... without objection by the State.

*Id.* at 112, ¶ 24; *see also id.* at 111, ¶ 18 ("The recording of Ms. Adams talking to the 911 operator was preserved by the Dallas Police Department. Ms. Kemp[, the prosecutor,] was aware of the existence of the 911 recording and was aware that Ms. Adams said on the recording that she saw a black male moving the body. Ms. Kemp did not inform defense counsel, James Belt, about the existence of the 911 call or its content. Mr. Belt was unaware of the existence of the 911 recording and its content at the time of the trial of [Blackman]'s case and did not learn of the 911 recording and its content until they were provided to him by [Mr. Jett] in 2011." (internal record citations omitted)).

The state-habeas trial court, after the benefit of an evidentiary hearing, found that the prosecutor's notes concerning her meeting with Ms. Adams one month prior to trial and the 911 recording where both favorable, material evidence that the State suppressed. *See* Dkt. No. 13-24 at 108-16. That court recommended that Blackman's conviction be vacated and that she receive a new trial. *See id.* at 116. But the TCCA disagreed and found that Blackman failed to show that the suppressed evidence was material. *See Ex parte Blackman*, No. WR-52,123-03, 2012 WL 4834113 (Tex. Crim. App. Oct. 10, 2012) (per curiam).

This Court's review of that decision is not its current focus. Instead, the only issue before the Court on Respondent's motion to dismiss is whether Blackman's current claims are time barred, as Respondent contends in a motion that he filed after the Court transferred this successive federal habeas application to the United States Court of Appeals for the Fifth Circuit for appropriate action, *see Blackman v. Stephens*, No. 3:13-cv-2073-P-BN, 2015 WL 694953 (N.D. Tex. Feb. 18, 2015), and after the Fifth Circuit granted Blackman leave to file a successive habeas petition, *see In re Blackman*, No. 15-10114 (5th Cir. June 18, 2015) (per curiam); *see also* Dkt. No. 19 at 6-7 (Respondent's original answer, asserting but then failing to develop "the complicated intricacies of the timebar issue at this time"); *cf. Watts v. Cain*, Civ. A. No. 12-1039, 2013 WL 2422777, at *5 (E.D. La. June 3, 2013) ("The Fifth Circuit has recognized that, when considering motions [for leave to file a successive habeas petition] pursuant to § 2244(b), it does not have a developed record and cannot determine whether the one-year statute of limitations should be statutorily or

equitably tolled" and "[a]s a result, a determination of compliance with § 2244(d) is left to" the district court "as a threshold matter." (citation omitted)).

## Legal Standards

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes a one-year statute of limitations for federal habeas proceedings brought under 28 U.S.C. § 2254. *See* ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996, Pub. L. 104-132, 110 Stat. 1214 (1996). The limitations period runs from the latest of:

> (A)     the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)     the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

"The Fifth Circuit has not decided whether 28 U.S.C. § 2244(d)(1) applies piecemeal to each claim or to the whole habeas application" but has observed that "it appears that applying the statute of limitations to each claim is consistent with AEDPA and the precedent of other circuits." *In re Young*, 789 F.3d 518, 528 n.3 (5th

Cir. 2015) (collected cases omitted). Regardless, the time during which a properly filed application for state post-conviction or other collateral review is pending is excluded from the limitations period. *See* 28 U.S.C. § 2244(d)(2).

Section 2244(d)(1)(D)

Both sides agree that, statutorily speaking, Section 2244(d)(1)(D) – the factual predicate provision – applies to Blackman's current claims.

> Congress did not provide a definition of the term "factual predicate," as used in § 2244(d)(1)(D)[, but t]hose courts that have given meaning to the term agree that a factual predicate consists only of the "vital facts" underlying the claim. *McAleese v. Brennan*, 483 F.3d 206, 214 (3d Cir. 2007); *see also Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998).... The facts vital to a habeas claim are those without which the claim would necessarily be dismissed under Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts (requiring a district judge to dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief") *or* Rule 12(b)(6) of the Federal Rules of Civil Procedure (allowing for dismissal of a civil complaint where the plaintiff has "fail[ed] to state a claim upon which relief can be granted").

*Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) (emphasis added); *see also Vega v. Stephens*, No. 3:14-cv-551-P-BK, 2015 WL 4459262, at *3 (N.D. Tex. July 20, 2015) (defining "the factual predicate" as "the vital or principal facts underlying [a petitioner's] claims" (citing *McAleese*, 483 F.3d at 214; *Rivas*, 687 F.3d at 535)).

While the undersigned generally agrees with the Second Circuit's factual predicate analysis, the analogy to Rule 12(b)(6) review is closer than the analogy to review under Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts. Rule 4 *sua sponte* disposition of a habeas petition is usually appropriate only when "it plainly appears" that a petition is time-barred or that a petitioner has failed

to exhaust state court remedies. Closer questions, such as when a factual predicate ripened, generally deserve closer scrutiny and merit at least a preliminary response to address whether the habeas claims are plausible. *Cf. Johnson v. City of Shelby, Miss.*, 574 U.S. ____, 135 S. Ct. 346, 347 (2014) (per curiam) (while a threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice, a claim survives dismissal under *Twombly* and *Iqbal*, if a claimant "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that he contends entitle him to relief (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e))).

Under Section 2244(d)(1)(D), the applicable date is the date on which vital facts are first discovered, not when evidence to support those facts is first acquired. "[If new information is discovered that merely supports or strengthens a claim that could have been properly stated without the discovery, that information is not a 'factual predicate' for purposes of triggering the statute of limitations under § 2244(d)(1)(D)." *Rivas*, 687 F.3d at 535 (citations omitted). For example, in *Flanagan*, the Fifth Circuit noted that the petitioner's statutory tolling argument "that [his] lawyer's affidavit forms part of the factual predicate of his suit because, by not conclusively negating the proposition, the affidavit implicitly support[ed his] claim that he was not informed of his right not to testify" "confus[ed] his knowledge of the factual predicate of his claim with the time permitted for gathering evidence in support of that claim," where the "affidavit neither change[d] the character of [his] pleaded due process claim nor provide[d] any new ground for [his] federal habeas petition." 154 F.3d at 198-99; *see Young*, 789 F.3d at

528 (Section 2244(d)(1)(D) runs from "the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim"); *Redmond v. Jackson*, 295 F. Supp. 2d 767, 772 (E.D. Mich. 2003) ("[I]t is the actual or putative knowledge of the pertinent facts of a claim that starts the clock running on the date on which the factual predicate of the claim could have been discovered through due diligence, and the running of the limitations period does not await the collection of evidence which supports the facts, including supporting affidavits." (citing *Tate v. Pierson*, 177 F. Supp. 2d 792, 800 (N.D. Ill. 2001) (in turn citing *Flanagan*, 154 F.3d at 198-99))).[1]

But "knowledge of the factual predicate underlying" a claim cannot be "based on" "unsubstantiated suspicion." *Jefferson v. United States*, 730 F.3d 537, 547 (6th Cir. 2013) ("[W]e cannot accept the government's argument that Jefferson had knowledge

---

[1] *See also Hunter v. Cain*, 478 F. App'x 852, 853 (5th Cir. 2012) (per curiam) ("[Petitioner] argues, pursuant to § 2244(d)(1)(D), that the limitations period should have commenced on February 17, 2009, when he received the DA's case file after his attorney-client relationship with Pulliam ended.... [But he] has not shown why he could not have discovered the report through the exercise of due diligence once it was disclosed to Pulliam. The district court correctly determined that Hunter's § 2254 application was untimely."); *Ballay v. Louisiana*, Civ. A. No. 06-10699, 2007 WL 4413990, at *6 (E.D. La. Dec. 13, 2007) (factual predicate of *Brady* claim "that the prosecution withheld a statement [witness gave to the sheriff's office] in which she allegedly made comments inconsistent with her trial testimony" was first "known by defense counsel at the time of trial, in that he asked for the statement to be produced"); *Toney v. Quarterman*, Civ. A. No. H-09-0083, 2009 WL 2356104, at *6-*7 (S.D. Tex. July 27, 2009) ("Unlike the petitioner in *Starns*[ *v. Andrews*, 524 F.3d 612 (5th Cir. 2008)], who was not aware of the existence of a material witness until that witness was deposed in the civil trial, Toney was fully aware at the time of his trial that a blood sample was taken from him," the factual predicate for his habeas claim. "Merely alleging new evidence to support facts that were known at an earlier date does not suffice to establish a new factual predicate." (internal citation omitted)).

of the factual predicate underlying his *Brady* claim based on his unsubstantiated suspicion that the prosecution withheld evidence regarding deals with cooperating witnesses.").

Relatedly, continuing with the *Brady* example, a petitioner's "unsubstantiated suspicion" that exculpatory evidence was withheld is not enough to allege a plausible constitutional claim. *See, e.g.*, *Brayboy v. Napel*, Civ. A. No. 2:11-cv-11021, 2012 WL 37395, at *6 (E.D. Mich. Jan. 9, 2012) ("The burden is on a habeas petitioner to prove that evidence that is required to be disclosed to him under *Brady* was not disclosed to him. Allegations that are merely conclusory or which are purely speculative cannot support a *Brady* claim." (citations omitted)); *cf. Jefferson*, 730 F.3d at 547 (acknowledging "the distinction between suspicions of misconduct and having sufficient facts to sustain a § 2255 motion. Generally, courts have held that 'conclusory allegations alone, without supporting factual averments, are insufficient to state a valid claim under § 2255.'" (collected cases omitted)). Thus, again, in the context of *Brady*, Section 2241(d)(1)(D) is "triggered by the discovery of [certain] information only if it actually constituted *Brady* material." *Floyd v. Cain*, Civ. A. No. 11-2819, 2012 WL 6162288, at *11 (E.D. La. Sept. 28, 2012), *rec. adopted*, 2012 WL 6162164 (E.D. La. Dec. 11, 2012) (citations, including to *Brayboy*, omitted).

Conclusions, legally significant or otherwise, "drawn from preexisting facts, even if the conclusions are themselves new, are not factual predicates for a claim." *Rivas*, 687 F.3d at 535; *see also United States v. Windham*, No. 1:09-cr-105-DMB-DAS, 2015 WL 5674846, at *2 (N.D. Miss. Sept. 25, 2015) (a petitioner cannot "blur the line

between *facts* and their corresponding *legal significance*" to extend the factual predicate date into the future (citing *United States v. Pollard*, 416 F.3d 48, 55 (D.C. Cir. 2005) ("Whether an attorney should have performed a particular task drives the *legal* inquiry into the existence of an ineffective-assistance-of-counsel claim. What the lawyer did or did not do in his representation of a prisoner is a 'fact' ...."); all emphases in originals).

As the Sixth Circuit has acknowledged, there is a tension between AEDPA's requirement that a petition contain enough factual plausibility and its requirement, under Section 2241(d)(1)(D), that a petition be filed "within one year of discovering the 'vital facts'" that support a claim, but that court of appeals

> decline[d] to interpret [those] competing requirements ... so as to create a trap that renders litigation of a successful [habeas] claim effectively impossible. "Without a clear standard [as to when suspicion and hints ripen into a factual predicate], it is likely that when a prisoner spends a tremendous amount of time establishing the validity of the facts, a court may find that the initial piece of uncorroborated information would be deemed a 'factual predicate' to start the statute-of-limitations period; if, however, a prisoner instead chooses to submit an application with the same piece of 'raw' information, it may fail the fact-pleading requirement."

*Jefferson*, 730 F.3d at 547-48 (quoting Limin Zheng, *Actual Innocence as a Gateway through the Statute-of-Limitations Bar on the Filing of Federal Habeas Corpus Petitions*, 90 CAL. L. REV. 2101, 2135 (2002)); *see also Bing v. United States*, Nos. 3:12-cv-446-TJC-MCR & 3:08-cr-281-J-32MCR, 2014 WL 4206193, at *3 n.2 (M.D. Fla. Aug. 25, 2014) (acknowledging the same "tension" "can" "create a trap" where "the 'vital facts' may be insufficient by themselves to satisfy the fact-pleading requirement").

-12-

Finally, for the factual predicate provision to apply,

> "a petitioner's diligence must merely be 'due' or 'reasonable' under the circumstances." *Starns v. Andrews*, 524 F.3d 612, 619 (5th Cir. 2008) (analyzing 28 U.S.C. § 2244(d)(1)(D)). As the Supreme Court has explained, "diligence can be shown by prompt action on the part of the petitioner as soon as he is in a position to realize" that he should act. *Johnson v. United States*, 544 U.S. 295, 308 (2005). In applying [the analogous 28 U.S.C.] § 2255(f)(4), "[t]he important thing is to identify a particular time when ... diligence is in order." *Id.*

*United States v. Jackson*, 470 F. App'x 324, 327 (5th Cir. 2012) (per curiam).

<u>Equitable Tolling and Actual Innocence</u>

The AEDPA statute of limitations is also subject to equitable tolling in "rare and exceptional" circumstances. *See Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998).

> "Equitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999) (internal quotation marks and citation omitted). "[T]he principles of equitable tolling ... do not extend to what is at best a garden variety claim of excusable neglect." *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96 (1990). Unfamiliarity with the legal process does not justify equitable tolling. *Turner v. Johnson*, 177 F.3d 390, 392 (5th Cir. 1999).

*United States v. Kirkham*, 367 F. App'x 539, 541 (5th Cir. 2010) (per curiam).

The United States Supreme Court also has determined that the AEDPA statute of limitations can be overcome by a showing of "actual innocence." *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). But the actual innocence gateway is only available to a petitioner who presents "'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Id.* at 1936 (quoting *Schlup v.*

*Delo*, 513 U.S. 298, 316 (1995)). That is, the new, reliable evidence must be sufficient to persuade the Court that "'no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Id.* at 1928 (quoting *Schlup*, 513 U.S. at 329); *see also Johnson v. Hargett*, 978 F.2d 855, 859-60 (5th Cir. 1992) ("The Supreme Court has made clear that the term 'actual innocence' means *factual*, as opposed to *legal*, innocence – 'legal' innocence, of course, would arise whenever a constitutional violation by itself requires reversal, whereas 'actual' innocence, as the Court stated in *McCleskey [v. Zant*, 499 U.S. 467 (1991)], means that the person did not commit the crime." (footnotes omitted and emphasis in original)).

## Analysis

It may be unclear how many separate claims Blackman now has before the Court. For example, Respondent believes "that Blackman has now presented five separate constitutional claims." Dkt. No. 64 at 4. What is clear, however, is that all of her current habeas claims turn on vital facts discovered by her current habeas counsel no sooner than August 27, 2009, the date on which he first discovered the prosecutor's notes.

Before going any further as to the significance of those notes, Respondent concedes that,

> [a]s to Blackman's claim that the prosecutor failed to disclose evidence of a 911 tape, after further discussion with the District Attorney's office, [he] can no longer refute with absolute certainty Blackman's date of May 24, 2011 as the date she first became aware of the 911 tape. Therefore, the Director is not proceeding with the statute of limitations defense as to this claim at this time.

*Id.* at 2 n.2

But the Court need not be concerned with how to allocate the factual predicates of Blackman's claims as to those based strictly the prosecutor's notes, those based on the prosecutor's notes and the 911 tape, and those based strictly the 911 tape, because neither the knowledge that the prosecutor's notes existed on August 27, 2009 nor that knowledge together with speculation as to whether Blackman or her previous counsel knew that those notes existed ripened into, on that date, a factual predicate for any claim Blackman now makes, including that the prosecution withheld exculpatory and material evidence; that the prosecution used false and misleading testimony at trial; or that Blackman is legally innocent.

For example, before counsel's "suspicion and hints" could "ripen into a factual predicate," *Jefferson*, 730 F.3d at 548, to support a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), one additional – but very vital fact – was needed: whether the prosecutor's notes had actually "been suppressed by the State." *Rocha v. Thaler*, 619 F.3d 387, 393 (5th Cir. 2010) ("A successful *Brady* claim has three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999))); *see* Dkt. No. 46-1 at 16-18 (Mr. Jett's Oct. 7, 2009 letter to Blackman, written after he first examined the DA's files, in which he informs Blackman that the prosecutor's notes "could be of benefit to you" and speculates as to

whether Blackman's trial counsel knew about the notes: "[i]t does not appear that Mr. Belt was aware of" the notes base on his cross-examination of Ms. Adams).

Similarly, while a claim that the State violated a defendant's due process rights by knowingly using, or failing to correct, false testimony "is related to, but conceptually distinct from, the prosecutor's duty to reveal exculpatory evidence to the defense," *Ogle v. Johnson*, 696 F. Supp. 2d 1345, 1362-63 (S.D. Ga. 2009) (citing *Brown v. Wainwright*, 785 F.2d 1457, 1464 (11th Cir. 1986)), here, the factual predicate for Blackman's due process claim turns on knowledge that her trial counsel was not aware that the prosecutor's notes existed.

Put another way, the existence of the notes, alone, did not provide Blackman with "knowledge of the pertinent facts of a claim" and, therefore, start the Section 2244(d)(1)(D) "clock running" on August 27, 2009. *Redmond*, 295 F. Supp. 2d at 772.

Relatedly, whether Blackman or her previous counsel were aware of the notes is not a conclusion drawn from an existing fact but is instead an independent fact that, for example, is vital to a claim under *Brady*, just like "[w]hat the lawyer did or did not do in his representation of a prisoner is a 'fact'" that is vital to an ineffective-assistance-of-counsel claim. *Pollard*, 416 F.3d at 55. In turn, whether the notes are material – like "[w]hether an attorney should have performed a particular task" – "drives the *legal* inquiry into the existence of" the respective constitutional claims. *Id.* (emphasis in original).

Respondent frames this dispute as "a legal one: whether the factual predicate of Blackman's claims relating to the prosecutor's undisclosed note, includes the time

her attorney spent gathering evidence to support them" and asserts that, "[o]n August 27, 2009, the date that Blackman first reviewed the prosecutor's file and saw the prosecutor's note, Blackman had all the information she needed to raise these claims in a federal writ petition." Dkt. No. 64 at 1 & 2. The undersigned agrees with Respondent's assertion to the extent that a factual predicate generally ripens before the time "spent gathering evidence to support" a claim, such as a sworn affidavit from a petitioner's trial counsel. *See, e.g.*, *Young*, 789 at 528; *Flanagan*, 154 F.3d at 198-99; *Hunter*, 478 F. App'x at 853. But the undersigned disagrees that, here, the prosecutor's note itself gave Blackman "all the information she needed to raise" her current federal claims.

Respondent argues that

Blackman is not entitled ... to the time it took for her attorney [Mr. Jett] to contact each of her prior lawyers and tell them of the new evidence, the time for each lawyer to retrieve a copy of Blackman's old file from storage and view it, the time it took for each of those lawyers to communicate their assessment of the claim to Blackman's current attorney, until over a year and two months had passed and the last attorney had submitted the final affidavit of his assessment of the claim on October 28, 2010.

Dkt. No. 64 at 9 (contending that "[i]t is hard to believe that is what Congress intended when it enacted the AEDPA statute of limitations' tight timeline to advance the finality of state court convictions" (citation omitted)).

But, because Mr. Jett lacked the knowledge to determine whether the prosecutor's notes were evidence that was available at Blackman's trial, he, on Blackman's behalf, was certainly entitled to time to discover whether the notes he discovered on August 27, 2009 were in fact evidence that neither Blackman nor Mr.

Belt, her trial counsel, knew about at the time of trial or sometime thereafter. Quite simply, if Mr. Belt or Blackman had informed Mr. Jett that they were indeed aware of this evidence, it would not constitute *Brady* material. *See, e.g.*, *Ballay*, 2007 WL 4413990, at *6; *Toney*, 2009 WL 2356104, at *6-*7 (petitioner or trial counsel's previous awareness of evidence undercuts factual predicate for a claim under *Brady*).

Respondent's argument above also appears to confuse vital fact-gathering with gathering evidentiary support for a claim. October 28, 2010, the date on which Respondent states that "the last attorney ... submitted the final affidavit of his assessment of the claim," is certainly not the date that the factual predicate first ripened. According to Mr. Jett, his speculation ripened into a factual predicate sometime earlier in 2010:

> After retrieving time records from storage, undersigned counsel has determined that his first contact with James Belt was on June 21, 2010. This was likely to have been a chance meeting at the Dallas County Courthouse, wherein counsel initiated some discussion with Mr. Belt about Ms. Blackman's case. Counsel's time records reflect that the next contact was a telephone conversation on July 15, 2010, that was likely initiated by undersigned counsel. Counsel does not recall whether the subject of Ms. Kemp's note and Ms. Adams' indecision was discussed first in June, or in July. The next recorded time record showing a contact with Mr. Belt was on September 30, 2010. In the conversations in June or July counsel believes Mr. Belt indicated he had no memory of being told that Ms. Adams chose someone else from the photo lineup, before she chose Petitioner, and wanted to review his file. Mr. Belt verified at a later time that he did not receive the information about Ms Adams' indecision, very possibly in the telephone conversation of September 30, 2010. It appears, based on that conversation, undersigned counsel drafted an affidavit for Mr. Belt, which was sent to him to revise as he chose. He ultimately signed an affidavit on October 14, 2010, and provided it to undersigned counsel on October 28, 2010.
>
> The first indication that undersigned counsel had that the information about Ms. Adams' indecision was not provided to defense was

in June or July, 2010. That fact was probably not confirmed by Mr. Belt until September 30, 2010. Adam Seidel, Petitioner's writ counsel, verified by email on June 10, 2010, that he had not seen the notes from Ms Kemp. Ms. Blackman's writ application that included a Brady claim based on the withholding of the information about Ms. Adams' indecision, was filed on December 17, 2010, well within one year from the time that counsel had sufficient information from which he could make a prima facie showing of a Brady violation.

Dkt. No. 68 at 3-4 (footnote omitted).

The affidavit at issue in *Flanagan* did not form "part of the factual predicate," and thus extend the running of Section 2244(d)(1)(D), because that "affidavit neither change[d] the character of [the] pleaded due process claim nor provide[d] any new ground for [the] federal habeas petition." 154 F.3d at 198-99. But, here, Mr. Belt's confirmation that the notes were never disclosed to him is necessary to state a plausible *Brady* violation.

Respondent certainly argues that Blackman is not entitled to equitable tolling. *See* Dkt. No. 64 at 13-16. But, as Blackman argues, the Court need not consider that question because the applicable state habeas application was filed on December 17, 2010, less than one year from the first time that Mr. Jett knew the vital fact that the prosecutor's notes he discovered on August 27, 2009 were suppressed evidence.

To be sure, some thirteen months (from August 27, 2009 to September 30, 2010) is not a slight lag in time. But Respondent stakes the position that discovery of the prosecutor's notes on August 27, 2009 by counsel who was only familiar with the trial record (not what went on behind the scenes at trial) was "all the information ... needed to raise these claims in a federal writ petition." Dkt. No. 64 at 2. Respondent has

chosen, then, not to argue that the time lag is evidence that Blackman was not diligent in pursuing her claims. *Cf. Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1335 (7th Cir. 1995) ("federal courts will not invent legal arguments for litigants"); *Jones v. Alfred*, 353 F. App'x 949, 952 (5th Cir. 2009) (federal courts will not "invent, out of whole cloth, novel arguments on behalf of" litigants, even those proceeding *pro se*).

And, even if that argument had been advanced, the undersigned cannot say that Blackman's diligence in this respect was not "'due' or 'reasonable' under the circumstances." *Starns*, 524 F.3d at 619.

In the end, because Blackman filed the applicable state habeas application approximately less than four months after the factual predicate ripened, and because this case was filed some seven months after the TCCA denied Blackman relief, all of Blackman's claims are timely pursuant to Section 2241(d)(1)(D), and the Court should deny the motion to dismiss.

## Recommendation

The Court should deny the motion to dismiss [Dkt. No. 45].

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation

where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: January 19, 2016

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE