IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TELISA DE'ANN BLACKMAN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | No. 3:13-cv-2073-M-BN |
| | § | |
| LORIE DAVIS, Director | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division,[1] | § | |
| | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

An application for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by

Petitioner Telisa De'ann Blackman, a Texas prisoner, represented by counsel, is again

before this Court. The operative habeas application, Blackman's second amended

petition, *see* Dkt. No. 54, was filed after the United States Court of Appeals for the

Fifth Circuit preliminary authorized Blackman to proceed as to a successive Section

2254 habeas application., *see In re Blackman*, No. 15-10114 (5th Cir. June 18, 2015)

(per curiam) [Dkt. No. 37]; 28 U.S.C. § 2244(b)(2)(B), (b)(3)(C).

Blackman asserts that, during her state murder trial in Dallas County, Texas,

the prosecutor withheld exculpatory and material evidence, *see Brady v. Maryland*, 373

U.S. 83 (1963), and also used false and misleading testimony, *see Giglio v. United*

---

[1] Lorie Davis has succeeded William Stephens as Director of the Texas Department of Criminal Justice, Correctional Institutions Division, and, as his successor, she is "automatically substituted as a party." FED. R. CIV. P. 25(d).

*States*, 405 U.S. 150, 153 (1972), and *Napue v. Illinois*, 360 U.S. 264, 271 (1959), and she further asserts that she is legally innocent under *Schlup v. Delo*, 513 U.S. 298 (1995).

Although this action was reassigned to Chief Judge Barbara M. G. Lynn after the retirement of then-Chief Judge Jorge A. Solis, *see* Dkt. No. 83, it remains referred to the undersigned United States magistrate judge pursuant to 28 U.S.C. § 636(b) and a standing order of reference from Judge Lynn.

As the current action was initiated upon Blackman's filing of a third Section 2254 habeas application, and because, in preliminarily authorizing the filing of this successive action, the Fifth Circuit found merely that Blackman has "made a *prima facie* showing that she can satisfy the requirements of" Section 2244(b)(2)(B), and she thus "has made a 'sufficient showing of possible merit to warrant a fuller exploration by the district court,'" Dkt. No. 37 at 2 (quoting *In re Swearingen*, 556 F.3d 344, 347 (5th Cir. 2009)), this Court now "must conduct a 'thorough' review to determine if the [habeas application] 'conclusively' demonstrates that it does not meet [the Antiterrorism and Effective Death Penalty Act's ("AEDPA")] second or successive motion requirements," *Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001) (quoting *United States v. Villa-Gonzalez*, 208 F.3d 1160, 1165 (9th Cir. 2000)); *see* 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section.").

Because a thorough review reveals that Blackman has not shown that "the facts underlying the [claims presented in this successive habeas application], if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [her] guilty of the underlying offense," 28 U.S.C. § 2244(b)(2)(B)(ii), the undersigned issues the following findings of fact, conclusions of law, and recommendation that the Court should dismiss Blackman's successive habeas application for lack of jurisdiction but also grant Blackman a certificate of appealability as to her *Brady* claim and her claim under *Giglio/Napue*.

## Applicable Background

Blackman was charged by indictment with the June 22, 2007 murder of Lisa Davis, her roommate with whom she also was romantically involved. She pleaded not guilty, proceeded to trial by jury, and was found guilty on September 30, 1998. She was sentenced to life imprisonment.

Blackman timely appealed; the Dallas Court of Appeals affirmed her conviction and sentence, *see Blackman v. State*, No. 05-98-01750-CR, 2000 WL 567985 (Tex. App. – Dallas May 8, 2000); and her petition for discretionary review was refused by the Texas Court of Criminal Appeals (the "CCA"), *see Blackman v. State*, PDR No. 1293-00 (Tex. Crim. App. Nov. 22, 2000).

Below are the facts of this case as heard at Blackman's trial and summarized by the Dallas Court of Appeals:

[Blackman] and the decedent, Lisa Davis, lived together in a lesbian

-3-

relationship. One of the decedent's friends testified that the relationship was somewhat stormy and that, shortly before her death, the decedent wanted to end the relationship with [Blackman], although she was apprehensive about doing so.

The couple lived in a second-floor apartment, accessible by an outdoor stairway to a balcony in front of the apartment. [Blackman] testified that, on Sunday evening, June 22, 1997, she left the apartment complex to go to a nearby convenience store, Quick Way. Upon returning, she realized she did not have her apartment key or her pass card to the apartment complex; she would have to ring the buzzer to be let into the complex. She went to the entryway of the apartment complex and, while she was standing on the sidewalk before going upstairs, she saw the decedent's feet lying on the balcony in front of their apartment. The apartment door was open, and the body was lying partially inside the apartment and partially outside. Decedent had been shot. [Blackman] called the decedent's name, and eventually touched the decedent, but the decedent did not respond. [Blackman] pulled the decedent's body inside their apartment. In doing so, she moved the decedent's feet to the side, to get them inside the apartment. She then shut the door and dialed 911. As a result of dragging the decedent's body inside the apartment complex, she got blood on her socks and shoes.

Cathy Harding, a Dallas police detective, searched [Blackman] in the homicide office at police headquarters because the only officers called to the crime scene were male; it was against department policy to have a male officer search a female suspect. Harding found blood on the soles of [Blackman]'s socks. [Blackman] told Harding that she had not taken her shoes off that evening.

When Daniel Krieter, a Dallas police investigator, arrived at the murder scene, [Blackman] asked him if he remembered her from an incident that had occurred about a year earlier. [Blackman] had been shot by a gun, a .25 caliber Lorcin, that she owned. When the police closed their investigation into that incident, [Blackman] reclaimed the gun from the department's property room. [Blackman] testified at trial that the gun was stolen some two months after she had reclaimed it in August 1995. She did not report it as stolen, however, because it was not registered. [Blackman] consistently denied that she had a gun on the night of the murder.

No gun was found; however, Krieter's search of the apartment revealed some spent shell casings on the floor and some live shell casings in a

bureau drawer. The casings were .25 caliber and would fit a Lorcin. [Blackman] and the decedent had moved into the apartment only some thirty days before the decedent's death. [Blackman] explained that she moved in such haste she did not have time to throw out the live shell casings so she simply moved them.

Robert L. Ermatinger, a Dallas police homicide investigator, questioned [Blackman] at the scene. [Blackman] told him she had gone to "the store" when the shooting occurred, although she could not say which store. When pressed, [Blackman] said she realized while enroute to the store she had forgotten her gate key and returned to the complex rather than going on to the store. When Ermatinger asked [Blackman] at the scene if "they were a couple," that is, whether [Blackman] and the decedent had a lesbian relationship, [Blackman] said "they were not."

Finally, Cherissa Adams, a neighbor who lived on the first floor, testified that, on the evening of June 22, 1997, she heard a loud noise that sounded like gunfire. She looked out her window and saw a lifeless body. A young, thin girl was trying to move the body. The body's upper portion was inside an apartment. After Adams called 911, she returned to the window and continued to look out. The person who had moved the body locked the door and went downstairs. When the person looked in Adams's direction, Adams closed the blinds and moved away from the window. Adams had never seen the person before that evening and never saw her again. Adams was not able to identify [Blackman] in court; at 11:35 p.m. on the night of the shooting, however, Adams did identify [Blackman] in a photographic lineup.

2000 WL 567985, at *1-*2.

Blackman filed her first state habeas application on January 16, 2002, *see Ex parte Blackman*, No. 52,123-01, and her writ was denied by the CCA on April 24, 2002. She filed her first federal habeas application in this Court on July 19, 2002. *See Blackman v. Cockrell*, No. 3:02-cv-1559-G, 2003 WL 21782254 (N.D. Tex. Apr. 18, 2003). That application was denied as time-barred. *See id.* at *2-*3. And this Court also denied a second federal habeas application filed by Blackman for the same reason. *See*

*Blackman v. Dretke*, No. 3:04-cv-1834-P, 2004 WL 2173444 (N.D. Tex. Sept. 8, 2004), *rec. adopted*, 2004 WL 2468819 (N.D. Tex. Nov. 2, 2004).

Blackman filed her second state habeas application on October 10, 2005, *see Ex parte Blackman*, No. 52-123-02, and that writ was denied by the CCA on March 1, 2006. Blackman, represented by counsel, filed a third state habeas application on December 17, 2010. *See Ex parte Blackman*, No. 52,123-03.

The third state application was filed after the Dallas County District Attorney's Office (the "DA") granted Blackman's counsel access to its file on August 27, 2009. *See* Dkt. No. 13-24 at 112, ¶ 25 (state-habeas trial court findings of fact and conclusions of law). Once Blackman's counsel had access to the DA's file, he discovered notes from the prosecutor – never turned over to defense counsel – indicating that Ms. Adams had told the prosecutor, in an interview one month prior to trial, "that Ms. Adams picked someone else out of the line up first and then changed her mind and selected [Blackman]." *Id.* at 110-11, ¶¶ 15, 16.

In addition to the notes, counsel also obtained a cassette recording of the 911 call Ms. Adams made the day of the murder.

> Ms. Adams told the 911 operator that she thought she heard a gunshot in her apartment complex, which causes her to look out of the window of her apartment, located on the ground floor of the complex, towards another apartment in the complex. Ms. Adams told the 911 operator that she saw a man lying down in the doorway and a black man that pushed him inside the apartment and closed the door. She told the operator that she could look out her window and see straight up into the apartment where the events occurred.

*Id.* at 108, ¶ 1.

As to the discovery of the 911 recording, the state-habeas trial court found the following:

> After Ms. Blackman's [third] writ application was filed, Assistant District Attorney Christine Womble contacted Detective Ermatinger, who was the lead detective on the case against Ms. Blackman. Ms. Womble asked Mr. Ermatinger to retrieve the Dallas Police Department file so Ms. Womble could compare it to the District Attorney's file to see if there was anything that the D.A.'s office did not have. Ms. Womble searched through the Dallas Police Department file and found a cassette tape that had a recording of Ms. Adams' 911 call. The cassette recording was copied and promptly provided to Defendant's counsel, J. Craig Jett, in 2011, prior to the hearing on Ms. Blackman's [third] Application for Writ of Habeas Corpus. The 911 recording was admitted into evidence at the writ hearing ... without objection by the State.

*Id.* at 112, ¶ 24; *see also id.* at 111, ¶ 18 ("The recording of Ms. Adams talking to the 911 operator was preserved by the Dallas Police Department. Ms. Kemp[, the prosecutor,] was aware of the existence of the 911 recording and was aware that Ms. Adams said on the recording that she saw a black male moving the body. Ms. Kemp did not inform defense counsel, James Belt, about the existence of the 911 call or its content. Mr. Belt was unaware of the existence of the 911 recording and its content at the time of the trial of Ms. Blackman's case and did not learn of the 911 recording and its content until they were provided to him by [Mr. Jett] in 2011." (internal record citations omitted)).

On July 3, 2012, and after the benefit of an evidentiary hearing, the state-habeas trial court found that the prosecutor's notes concerning her meeting with Ms. Adams one month prior to trial and the 911 recording where both favorable evidence, suppressed by the State, and material. *See* Dkt. No. 13-24 at 108-16. That court

recommended that Blackman's conviction be vacated and that her case be remanded for a new trial. *See id.* at 116.

But the CCA disagreed and found that Blackman had failed to show that the suppressed evidence was material:

> Blackman first complains that the State withheld the recording of Adams's 911 call the night of the murder, during which she reported seeing a black man move a lifeless body. Blackman is female. Blackman's second claim regarding Adams's identification of Blackman from the photographic lineup on the night of the murder stems from a note in the prosecution's case file relating to a conversation with Adams about the identification. The note reads, in part, "[p]icked out someone else first, then changed mind [and] selected [Blackman] (Bust photo)." Blackman contends, and trial counsel confirmed at the writ hearing, that if the prosecution had disclosed this evidence, the defense could have used it to impeach Adams's testimony at trial that she saw Blackman drag a body into her apartment and might have followed a different investigative trail. Counsel also stated that, had he known this information, he would not have called Blackman as a witness and the jury would not have heard her testify about dragging the victim into her apartment.
>
> With regard to the investigative value of this withheld evidence, Blackman fails to identify what, if anything, this might have unearthed that would have sufficiently undermined confidence in the outcome at trial. Similarly, she fails to show how impeaching Adams would probably have affected the results of the proceedings, particularly given the fact that – as Blackman concedes in her memorandum in support of her application – at least one officer testified at trial that Blackman admitted to dragging the victim into her apartment. Finally, Blackman makes no showing that the outcome would probably have been different had she chosen not to testify. Relief is denied.

*Ex parte Blackman*, No. WR–52,123–03, 2012 WL 4834113, at *1-*2 (Tex. Crim. App. Oct. 10, 2012) (per curiam).

In responding initially to this federal petition, Respondent chose to defend against Blackman's claims on the merits. *See* Dkt. No. 19; *see also id.* at 6-7 (merely

asserting, but then failing to develop, "the complicated intricacies of the timebar issue at this time"). While Respondent did not raise the issue of whether Blackman's third federal habeas application should be considered successive within the meaning of AEDPA, the Court was obligated to answer that question to determine whether there is subject-matter jurisdiction. *See Leal Garcia v. Quarterman*, 573 F.3d 214, 219 (5th Cir. 2009) ("AEDPA requires a prisoner to obtain authorization from the federal appellate court in his circuit before he may file a 'second or successive' petition for relief in federal district court. Without such authorization, the otherwise-cognizant district court has no jurisdiction to entertain a successive § 2254 petition." (footnotes omitted)).

On February 18, 2015, Judge Solis accepted the undersigned's findings of fact, conclusions of law, and recommendation that this petition is truly successive – because the claims asserted are "based on facts that were merely undiscoverable," *Stewart v. United States*, 646 F.3d 856, 863 (11th Cir. 2011); *see also Leal Garcia*, 573 F.3d at 221 (numerically subsequent petitions attacking the same conviction but "based on newly discovered *evidence*" are nevertheless successive because "Section 2244(b)(2)(B)(i) states that claims based on a *factual* predicate not previously discoverable are successive" (emphasis in original)) – and that the petition therefore should be transferred to the Fifth Circuit for appropriate action, *see Blackman v. Stephens*, No. 3:13-cv-2073-P-BN, 2015 WL 694953 (N.D. Tex. Feb. 18, 2015) ("*Blackman I*").

On June 18, 2015, a panel of the Fifth Circuit preliminary authorized Blackman to proceed, first rejecting her argument "that her *Brady* claim should not be subject to

[the] requirements" of 28 U.S.C. § 2244(b) but then finding alternatively that she made *prima facie* showings "that her *Brady* and *Giglio* claims satisfy the § 2244(b)(2)(B) standard." Dkt. No. 37 at 2.

On February 26, 2016, the Court denied Respondent's motion that the Court dismiss this action as time-barred. *See Blackman v. Stephens*, No. 3:13-cv-2073-P-BN, 2016 WL 777695 (N.D. Tex. Jan. 19, 2016), *rec. adopted*, 2016 WL 759564 (N.D. Tex. Feb. 26, 2016) ("*Blackman II*").

And, on May 4, 2016, the Court conducted oral argument as to the claims in the operative, successive habeas application.

## Legal Standards and Analysis

I.  <u>This Court's "second-gatekeeper" function as to jurisdiction and the dual requirements of 28 U.S.C. § 2244(b)(2)(B)</u>

"The filing of a second or successive § 2254 application is tightly constrained by the provisions of AEDPA," *Case v. Hatch*, 731 F.3d 1015, 1026 (10th Cir. 2013), "[o]ne purpose of [which] is to enforce the preference for the state's interest in finality of judgment over a prisoner's interest in additional reviews," *Johnson v. Dretke*, 442 F.3d 901, 909 (5th Cir. 2006) (citing *Calderon v. Thompson*, 523 U.S. 538, 557 (1998)). To further this purpose, "AEDPA sets out a bifurcated procedure before conferring jurisdiction over an inmate's successive claim." *Swearingen v. Thaler*, Civ. A. No. H-09-300, 2009 WL 4433221, at *10 (S.D. Tex. Nov. 18, 2009), *dismissal of successive habeas pet. aff'd*, 421 F. App'x 413 (5th Cir. 2011) (per curiam).

While the Fifth Circuit has preliminarily authorized Blackman to file an

application presenting claims that are successive – because she has shown "that it is 'reasonably likely' that [the] successive petition meets section 2244(b)'s 'stringent requirements,'" *id.* (quoting *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003)) – that decision "is 'tentative' in that a district court must dismiss the habeas action that the circuit has authorized if the petitioner has not satisfied the statutory requirements," *id.* (quoting *Reyes-Requena*, 243 F.3d at 899 (in turn quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)); internal quotation marks omitted); *see In re Swearingen*, 556 F.3d at 349 ("We reiterate that this grant is tentative in that the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits, if the court finds that the movant has not satisfied the § 2244(b)(2) requirements for the filing of such a motion." (citations omitted)); *see also Jordan v. Sec'y, Dep't of Corrs.*, 485 F.3d 1351, 1358 (11th Cir. 2007) (stating that it makes "no sense for the district court to treat [a court of appeals's] *prima facie* decision as something more than it is or to mine [the circuit court's] order for factual ore to be assayed" and directing that "[t]he district court is to decide the § 2244(b)(1) & (2) issues fresh, or in the legal vernacular, *de novo*" (citations omitted)).

Here, the applicable statutory requirements mandate that "[a] claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underling the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and

> convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2).

As implied above, these "gate-keeping requirements are jurisdictional in nature, and must be considered prior to the merits of a § 2254 petition." *Case*, 731 F.3d at 1027 (citing *Panetti v. Quarterman*, 551 U.S. 930, 942-47 (2007)); *see In re Swearingen*, 556 F.3d at 347 ("[B]efore addressing the merits of the successive petition, the district court must independently determine whether the petition actually satisfies the stringent § 2244(b)(2) requirements."); *Johnson*, 442 F.3d at 910 ("[T]he merits of *Brady* cannot be collapsed with the due diligence requirements of § 2244(b)(2)(B)(i)." (citing *Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002))); *see also Case*, 731 F.3d at 1027 (observing that Section 2244(b)'s requirement "that a successive habeas corpus application 'shall be dismissed' unless the gate-keeping requirements are met … clearly speaks to the power of the court to entertain the application, rather than any procedural obligation of the parties" and "also sets forth a 'threshold limitation on [the] statute's scope,' providing further indication that the gate-keeping requirements are jurisdictional rules, not mere claim-processing rules" (quoting *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012))).

Blackman "bears the burden of demonstrating that [her] petition does in fact comply with the statute, and the [Fifth Circuit has directed that the] district court shall dismiss the petition unless that showing is made." *Moore v. Dretke*, 369 F.3d 844, 845 n.1 (5th Cir. 2004).

II.   Due diligence under 28 U.S.C. § 2244(b)(2)(B)(i)

As to the first prong of Section 2244(b)(2)(B) – a petitioner's due diligence as to discovery of the factual predicate of his claims – the Fifth Circuit clarified recently that "the time of 'discovery' [is] the time at which the matter was first litigated in the federal habeas proceeding." *In re Masterson*, 638 F. App'x 320, 326 (2016) (per curiam) (citing *Kutzner*, 303 F.3d at 336 ("Kutzner fails to demonstrate that prosecutorial misconduct in this regard prevented him from discovering the factual basis of his successive claims at the time his first habeas petition was *litigated*."); emphasis added in *Masterson*).

Here, in determining that Blackman made a *prima facie* showing as to this prong, the Fifth Circuit relied on the state-habeas trial court's finding "that the newly discovered evidence could not have been obtained earlier through the exercise of due diligence, a finding that was undisturbed by the Texas Court of Criminal Appeals and enjoys deference." Dkt. No. 37 at 2; *see also* Dkt. No. 13-24 at 110-11, ¶¶ 15, 16, 18 (noting that the first evidence supporting Blackman's third state habeas application was not discovered until August 2009).

Similarly, this Court has denied Respondent's motion to dismiss this action as time-barred under 28 U.S.C. § 2244(d)(1)(D), and, in denying that motion, the Court observed that is "clear" "that all of [Blackman's] current habeas claims turn on vital facts discovered by her current habeas counsel no sooner than August 27, 2009, the date on which he first discovered the prosecutor's notes," *Blackman II*, 2016 WL 777695, at *7 – which occurred more than seven years after Blackman filed her first

federal habeas petition (and more than five years after she filed her second).

The two inquiries, one under Section 2244(b) and the other under Section 2244(d), serve different purposes. *Cf. Watts v. Cain*, Civ. A. No. 12-1039, 2013 WL 2422777, at *5 (E.D. La. June 3, 2013) ("The Fifth Circuit has recognized that, when considering motions [for leave to file a successive habeas petition] pursuant to § 2244(b), it does not have a developed record and cannot determine whether the one-year statute of limitations should be statutorily or equitably tolled" and, "[a]s a result, a determination of compliance with § 2244(d) is left to" the district court "as a threshold matter." (citation omitted)).

> [But t]here is an obvious linguistic and interpretative similarity between the application of due diligence to the one-year statute of limitations issue under § 2244(d)(1)(D) ... and the due diligence requirement with regard to newly discovered evidence that would allow a second or successive habeas petition under § 2244(b)(2)(B)(i).

*Pabon v. United States*, 990 F. Supp. 2d 254, 259 (E.D.N.Y. 2013); *see also Melson v. Allen*, 548 F.3d 993, 999 (11th Cir. 2008) ("Although we have not defined due diligence with respect to a § 2244(d)(1)(D) claim, we have addressed it in the analogous context of a second federal habeas petition which is based on newly discovered facts." (citation omitted)), *vacated on other grounds*, 561 U.S. 1001 (2010); *Gimenez v. Ochoa*, Civ. No. 12-1137 LAB (BLM), 2013 WL 8178829, at *20 (S.D. Cal. Nov. 22, 2013), *rec. adopted*, 2014 WL 1302463 (S.D. Cal. Mar. 28, 2014) ("His inability to satisfy [Section 2244(b)(2)(B)(i)] necessarily means he has not satisfied 28 U.S.C. § 2244(d)(1)(D) either."), *aff'd*, 821 F.3d 1136 (9th Cir. 2016).

Therefore, for the reasons that the Court found that Blackman's current claims

are not time-barred, *see Blackman II*, 2016 WL 777695, the undersigned recommends that the Court now find that the same claims are not procedurally-barred, *see In re Young*, 789 F.3d 518, 529 (5th Cir. 2015) ("We find that Young's claims regarding [whether] Kemp and Hutchinson [lied in their testimony] are not time barred by 28 U.S.C. § 2244(d)(1)(D), or procedurally barred by 28 U.S.C. § 2244(b)(2)(B)(i).").

III.   Constitutional error under 28 U.S.C. § 2244(b)(2)(B)(ii)

Under Section 2244(b)(2)(B)'s second prong, the Court does not view Blackman's "arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Kutzner*, 303 F.3d at 339 (quoting *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000)). In fact, at this stage – before the Court is satisfied that it possesses jurisdiction over Blackman's successive habeas petition – the Court does not even consider the merits of her claimed constitutional violations. *See In re Swearingen*, 556 F.3d at 347; *see also Case*, 731 F.3d at 1032 (If "we reach the merits, we will apply the deferential standards of § 2254 in determining whether an actual constitutional violation occurred. To require a full showing at this stage would collapse the § 2254 inquiry into § 2244, making § 2244 redundant." (citation omitted)).

Instead, "subparagraph (B)(ii) requires the applicant to identify a constitutional violation and show that he would not have been found guilty 'but for' the violation." *Case*, 731 F.3d at 1032. This standard of review "has been described as 'a strict form of 'innocence,' ... roughly equivalent to the Supreme Court's definition of 'innocence' or 'manifest miscarriage of justice' in *Sawyer v. Whitley*." *Johnson*, 442 F.3d at 911 (quoting 2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE &

PROCEDURE § 28.3e, at 1459-60 (5th ed. 2005) (citing *Sawyer v. Whitley*, 505 U.S. 333 (1992))); *accord In re Brown*, 457 F.3d 392, 395 (5th Cir. 2006); *Case*, 731 F.3d at 1031-32.

Blackman "has successfully identified a *Brady* violation," for example, so the Court "must determine whether the newly discovered evidence, based on the record as a whole, would lead every reasonable juror to a conclusion of 'not guilty.'" *Case*, 731 F.3d at 1032; *see also id.* at 1033 (describing the analysis as three-fold: (1) "start with the evidence produced at trial, (2) add 'evidence allegedly kept from the jury due to an alleged constitutional violation,' *Sawyer*, 505 U.S. at 349, and (3) determine whether it is 'clear and convincing,' 'in light of the evidence as a whole,' that 'no reasonable factfinder would have' convicted [Blackman]. 28 U.S.C. § 2244(b)(2)(B)(ii)." (brackets in original omitted)); *In re Martinez*, No. 09-10191, 2009 WL 585616, at *2 (5th Cir. Mar. 9, 2009) (per curiam) ("Martinez cannot meet his burden of demonstrating that no reasonable juror would have convicted him had Monique Walker produced the evidence at trial that she asserts in her affidavit, which is largely cumulative of evidence the jury rejected." (citations omitted)); *Swearingen*, 2009 WL 4433221, at *24 ("Congress has tethered this Court's analysis to how a reasonable juror would view the whole of the evidence as it was at trial and as it is now.").

Because the same newly discovered evidence supports the *Brady* violation and the *Giglio/Napue* violation that Blackman has identified, the undersigned will analyze those identified violations together. *Cf. Ogle v. Johnson*, 696 F. Supp. 2d 1345, 1362-63 (S.D. Ga. 2009) ("A prosecutor's duty not to knowingly present false evidence is related

to, but conceptually distinct from, the prosecutor's duty to reveal exculpatory evidence to the defense." (citing *Brown v. Wainwright*, 785 F.2d 1457, 1464 (11th Cir. 1986))); *Brady*, 373 U.S. at 87 (suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution"). But the undersigned first takes up Blackman's separate claim of innocence under *Schlup v. Delo*, 513 U.S. 298 (1995).

While *Schlup* concerns the treatment of "constitutional claims procedurally defaulted in state court that have never been evaluated by a state or federal court," *Case*, 731 F.3d at 1036 (citing *Schlup*, 513 U.S. at 314-15; *House v. Bell*, 547 U.S. 518 (2006)), Blackman claims that she "is innocent under *Schlup v. Delo*," because, "[i]f the State had not [committed the identified constitutional violations], no juror acting reasonably would have voted to find her guilty beyond a reasonable doubt," and, accordingly, "[a]ny procedural bars to consider [her] constitutional claims are overcome by the prosecution's suppression of exculpatory evidence and use of false testimony." Dkt. No. 54 at 8-9; *see also id.* at 24 ("The Supreme Court has clearly stated that a habeas court should look at the cumulative effect of the withheld evidence in deciding whether that evidence was material, and whether a reasonable juror would have found the Defendant guilty beyond a reasonable doubt when considering such evidence, and how it would have changed the dynamics of the Petitioner's trial. Under the facts of Petitioner's case, ... *Schlup vs. Delo* ... provides a separate claim for relief as part of the equitable exception to AEDPA.").

As Blackman acknowledges, *see* Dkt. No. 54 at 19-20, a claim under *Schlup* is

not the same as an actual innocence claim under *Herrera v. Collins*, 506 U.S. 390 (1993). That said, an actual innocence claim, standing alone, likely does not survive "the plain language" of Section 2244(b)(2)(B)(ii). *In re Everett*, 797 F.3d 1282, 1290 (11th Cir. 2015) (per curiam) ("Under the plain language of the statute, § 2244(b)(2)(B)(ii) requires both clear and convincing evidence of actual innocence *and a constitutional violation*, which we have referred to as the 'actual innocence plus' standard. *In re Davis*, 565 F.3d 810, 823 (11th Cir. 2009). Unlike a 'typical constitutional claim,' such as one arising under *Brady v. Maryland*, 373 U.S. 83, (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or *Strickland v. Washington*, 466 U.S. 668 (1984), 'the statutory language does not readily accommodate' a freestanding claim of actual innocence. *Davis*, 565 F.3d at 823. Therefore, Everett's first claim fails to meet the statutory criteria. *See* 28 U.S.C. § 2244(b)(2)(B)(ii)." (emphasis in original)); *accord Gimenez v. Ochoa*, 821 F.3d 1136, 1143 (9th Cir. 2016); *Case*, 731 F.3d at 1038-39.

*Schlup*, too, likely has little to do with claims presented in a successive habeas application. As the United States Court of Appeals for the Tenth Circuit explained in *Case*:

> [T]he Supreme Court recognizes a difference between *Schlup/House* claims and claims under subparagraph (B)(ii). As it said in *House*, rejecting an argument that AEDPA superseded the *Schlup* standard, § 2244(b)(2)(B)(ii) does not "address[ ] the type of petition at issue here – a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence. Thus, the standard of review in these provisions is inapplicable." 547 U.S. at 539. In short, *Schlup* and *House* provide little guidance here since they dealt with procedurally defaulted habeas claims, which are evaluated under a different standard than successive habeas petitions. See 513 U.S. at 306.

731 F.3d at 1037 (footnote omitted).

But, as alleged here, Blackman's claim under *Schlup* merges into the Section 2244(b)(2)(B)(ii) analysis as to jurisdiction. For example, she claims that she is innocent under *Schlup* because of the *Brady* and *Giglio/Napue* violations that she has identified, and she further claims that no reasonable juror "would have voted to find her guilty" but for the constitutional violations that she has identified. Dkt. No. 54 at 8-9, 24. *Compare id.*, *with Case*, 731 F.3d at 1032 ("In sum, subparagraph (B)(ii) requires the applicant to identify a constitutional violation and show that [she] would not have been found guilty "but for" the violation. Here, [Blackman] has successfully identified a *Brady* violation[ and a *Giglio/Napue* violation], so [the Court] must determine whether the newly discovered evidence, based on the record as a whole, would lead every reasonable juror to a conclusion of 'not guilty.'").

Therefore, for the purpose of determining whether the Court has jurisdiction over the claims in this successive petition, because Blackman identifies no newly discovered evidence tethered solely to her *Schlup* claim – that is, the newly discovered evidence identified also supports her "typical constitutional claims" (under *Brady* and *Napue/Giglio*) – the Court need not decide now whether Blackman's *Schlup* claim is viable on its own.

But, before turning to the newly discovered evidence in the form of the prosecutor's notes and the 911 recording – which could have been used to impeach the testimony of Ms. Adams, the only eyewitness, and counter a Dallas police detective's account of Ms. Adams's identification of Blackman – it is important to reiterate that,

for present purposes, it is not necessary to analyze, for example, the materiality of this evidence, *see, e.g.*, *Rocha v. Thaler*, 619 F.3d 387, 393, 397 (5th Cir. 2010), or whether, in light of this evidence, the government knowingly used, or failed to correct, false testimony, *see, e.g.*, *United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002). Instead, the Court's "task is to look to the evidence the jury heard at trial, augmented by evidence from [the prosecutor's notes and the 911 recording], and then to make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Case*, 731 F.3d at 1039 (quoting *House*, 547 U.S. at 538 (quoting in turn *Schlup*, 513 U.S. at 329)). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538.

To begin, then, there is no dispute that Ms. Adams was the only eyewitness. More accurately, she was the only witness to place Blackman at the apartment at the time of the shooting – seconds after Ms. Adams heard what she later identified as a gunshot. *See* Dkt. No. 13-7 at 40 ("I heard a loud noise and I went to my back window and looked out. And I saw a lifeless body on the floor and I saw a young, thin girl trying to move around the body."); *see also id.* at 55-56.

Ms. Adams testified that she went "back and forth to the window" "about three times." *Id.* at 43. She testified that she saw Blackman on the balcony with the body the first time but that, by the last time she looked out, the body was no longer on the balcony. *See id.* Instead, Adams testified that, by then, Blackman "was locking the door and walking down the stairs." *Id.* at 43-44; *see also id.* at 60-61 (Ms. Adams confirming

that she saw Blackman twice – first, on the balcony moving the body, and a second time, leaving the apartment). Ms. Adams further testified that, "after [Blackman] locked the door," "[s]he looked in Adams's direction." *Id.* at 44; *see also id.* at 56. According to Ms. Adams, "[a]pproximately fives minutes" elapsed between the time that she first saw Blackman on the balcony until she then saw Blackman leaving the apartment. *See id.* at 66.

At Blackman's trial, Dallas Police Detective Lynette Harrison testified concerning the manner in which Ms. Adams identified Blackman from a photographic line-up on June 22, 1997. *See* Dkt. No. 13-7 at 68-77. Detective Harrison testified that Ms. Adams recognized Blackman as the person who committed the crime, and, according to Detective Harrison, Ms. Adams looked "through the photographs and picked out the photo of the defendant and said, 'This is the girl that I saw.'" *Id.* at 69. From the witness stand at trial, Detective Harrison identified Blackman as the person whose picture Ms. Adams identified. *See id.* at 69-70. As to Ms. Adams's ability to identify Blackman – whose photo was placed in the middle of the line-up – the prosecution elicited the following testimony from Detective Harrison:

> Q. Did Ms. Adams carefully review each photograph to the best of your recollection?
> A. Yes, she did.
>
> ....
>
> Q. Was Ms. Adams able to identify the defendant when she initially came to her photograph?
> A. Yes, she did. She stopped at the photograph and said, "This looks like the girl."
> Q. Did you give her any further instructions?
> A. I told her to look through the rest of the photographs and make sure.

Q. Did she do that?
A. Yes, she did.
Q. Did she change her mind in any way?
A. No, she did not.

*Id.* at 71-72

As to this testimony, the newly discovered evidence reflects, first, that Ms. Adams told the 911 operator that she saw a man lying down in the doorway and that a black man pushed him inside the apartment and closed the door and, second, that, when the prosecutor interviewed Ms. Adams one month prior to trial, Ms. Adams informed the prosecutor – as reflected in the prosecutor's notes – that she picked someone else out of the line-up first and then changed her mind and selected Blackman.

The certainty with which Ms. Adams identified Blackman, a certainty that was not impeached at trial, was an important aspect of the State's case. But Ms. Adams also testified that she witnessed someone – she testified that it was Blackman – drag the decedent into the apartment.

Blackman herself testified that she moved the decedent into the apartment upon discovering her in the doorway after returning from the store. *See* Dkt. No. 13-8 at 47-49. And, while Blackman states that she would not have testified at her trial had her counsel been provided the newly discovered evidence, *see, e.g.*, Dkt. No. 67-1 at 11-12, two Dallas police officers testified that Blackman told them that she moved the body into the apartment.

Officer Isidoro Negrete testified, on direct examination, that upon encountering

-22-

Blackman, she only kept repeating "I didn't do anything" and did not tell him that she

moved the victim. *See* Dkt. No. 13-7 at 82-83 ("Did she say anything else? No, ma'am.

She just repeated those words over and over."). But Officer Luis E. Canales testified,

also on direct examination, that, other than repeating that she did not do it, Blackman

also "told us that she went to the store and when she came back she walked up the

stairs. She saw the deceased laying in the doorway and that she pulled her in and

closed the door and locked it in fear that whoever had done it would return," *id.* at 90.

Similarly, when called as a rebuttal witness, Detective Robert A. Ermatinger testified

that he spoke with Blackman in private at the scene, in a patrol car, and stated:

> I asked her what happened that night. She said that she had left to go to
> the store. When she returned she found Ms. Davis laying on top of the
> balcony near the doorway and she had been bleeding. She said she tried
> to pull her back in the apartment, which she did.

Dkt. No. 13-8 at 80. According to Detective Ermatinger, Blackman further told him

"that when she was trying to pull the deceased in the apartment she was waving her

arms, trying to get somebody to help her and call the police." *Id.* at 81.

Even had Blackman not testified and her counsel impeached Ms. Adams's

identification testimony, and even if the jury had heard that Ms. Adams first believed

that she saw a black male move the decedent into the apartment and that Ms. Adams

did not identify Blackman initially from the photographic array, two police officers

testified that Blackman told them that she had moved decedent into the apartment

upon discovering her. Blackman does not advance (and there is no evidence to support)

a theory that an unidentified black male moved the body into – and then out of – the

apartment prior to Blackman's coming home to discover the decedent lying outside the apartment. And, while Blackman argues that Detective Ermatinger would not have testified had Blackman herself not testified, because his testimony was only offered as rebuttal to her's, *see, e.g.*, Dkt. No. 67-1 at 12-13, there is no reason to believe that his testimony would not have come in on direct examination – just like Officer Canales's testimony regarding Blackman moving the body into the apartment.

Moreover, the Court should not accept Blackman's argument that counsel likely would have moved to suppress her statements to the officers on June 22, 1997. *See id.* at 8 ("From the current record, without any [Article] 38.22 warnings, it is likely that the Defendant's oral statements that were made in response to custodial interrogation could have been suppressed. In state court, unlike in federal court, oral statements made in response to custodial interrogation without Article 38.22 warnings are not admissible. *However, it is also quite possible that Mr. Belt had wanted the jury to hear Ms. Blackman's statements to the police officer when they arrived at her apartment.* If Mr. Belt had planned for the Defendant to not testify it is likely he would have tried to suppress her statements made after she was arrested." (emphasis added)).

Trying to get into the mind of Blackman's trial counsel, to advocate for one of two alternative, reasonable trial strategies, and then also accepting that the trial court would have granted a motion to suppress had one been filed engages in a level of speculation far from the task at hand – which is to augment the evidence that the jury heard at trial with the suppressed evidence and then to "make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *House*, 547

U.S. at 538 (quoting *Schlup*, 513 U.S. at 329).

Particularly given the testimony at trial corroborating a key component of Ms. Adams's testimony – that shortly after shots were fired, someone moved the decedent into the apartment, where, later, she was discovered with Blackman – the facts underlying Blackman's constitutional claims, accepted as true "and viewed in light of the evidence as a whole," are not "sufficient to establish by clear and convincing evidence," 28 U.S.C. § 2244(b)(2)(B)(ii) – evidence that "exonerate[s,]" *In re Pruett*, 609 F. App'x 819, 823 (5th Cir. 2015) (per curiam) – "that, but for constitutional error, no reasonable factfinder would have found [Blackman] guilty of the underlying offense," 28 U.S.C. § 2244(b)(2)(B)(ii).

Therefore, because Blackman has not established this second statutory requirement, the Court lacks jurisdiction over her successive Section 2254 habeas application, and the application should be dismissed.

IV.   <u>Certificate of appealability</u>

In preliminary authorizing the filing of this successive habeas action, a panel of the Fifth Circuit rejected Blackman's argument that her *Brady* claim should not be subject to Section 2244(b)(2). *See* Dkt. No. 37 at 2 ("As she concedes, this court has held otherwise. *See Leal Garcia v. Quarterman*, 573 F.3d 214, 220-22 (5th Cir. 2009); *Johnson v. Dretke*, 442 F.3d 901, 906-12 (5th Cir. 2006). 'It is well-established in this circuit that one panel of this Court may not overrule another.'" (citation omitted)). Rejecting Blackman's argument under the prior-panel rule certainly made sense at the time that the Fifth Circuit decided to send this matter back to the district court for

fuller exploration as to whether all requirements of Section 2244(b)(2) are met. But there is authority outside of this circuit regarding the conflict that appears inherent between claims under *Brady* that are both timely and material but also successive – because a subsequent petition attacking the same conviction but "based on newly discovered *evidence*" is nevertheless successive as "Section 2244(b)(2)(B)(i) states that claims based on a *factual* predicate not previously discoverable are successive," *Leal Garcia*, 573 F.3d at 221 (emphasis in original) – and the showing required under Section 2244(b)(2)(B)(ii) that must be made before the Court can consider the state court's adjudication of such *Brady* claims.

As the United States District Court for the Eastern District of Missouri has explained:

> Several circuit courts have confronted the issue of whether claims brought pursuant to *Brady* are subject to the AEDPA's second or successive petition restrictions. Most circuits are in agreement that *Brady* claims are not exempt from the second or successive restrictions. *See, e.g.*, *Quezada v. Smith*, 624 F.3d 514, 520 (2d Cir. 2010) (applying § 2244(b) to *Brady* claim); *In re Siggers*, 615 F.3d 477, 479 (6th Cir. 2010) (same); *Tompkins v. Secretary, Dept. of Corrections*, 557 F.3d 1257, 1259-60 (11th Cir. 2009) (holding that all second-in-time *Brady* claims are subject to AEDPA's gatekeeping provisions); *Evans v. Smith*, 220 F.3d 306, 323 (4th Cir. 2000) (same); *see also Johnson v. Dretke*, 442 F.3d 901, 911 (5th Cir. 2006) ("a successive petitioner urging a *Brady* claim may not rely solely upon the ultimate merits of the *Brady* claim in order to demonstrate due diligence under § 2244(b)(2)(B) where the petitioner was noticed pretrial of the existence of the factual predicate's ultimate potential exculpatory relevance").
>
> The Ninth Circuit, on the other hand, has ruled that *Brady* claims are not categorically exempt from the gatekeeping provisions, although second-in-time *Brady* claims that do not establish the materiality of the suppressed evidence are subject to dismissal. *United States v. Lopez*, 577 F.3d 1053, 1064-68 (9th Cir. 2009); *see also King v. Trujillo*, 638 F.3d 726,

733 (9th Cir. 2011).

> Although the Eighth Circuit has not clearly stated that all *Brady* claims in second § 2255 motions require preauthorization regardless of materiality, the Court of Appeals has indicated that if the movant raises only nonmaterial *Brady* claims, finding such claims to be second or successive is consistent with the AEDPA's goals of "finality, prompt adjudication, and federalism." *See Crawford v. Minnesota*, 698 F.3d 1086, 1090 (8th Cir. 2012) (quoting *Evans*, 220 F.3d at 321).

*Settle v. United States*, No. 4:13cv1852, 2013 WL 5421985, at *2 (E.D. Mo. Sept. 26, 2013) (some citations modified); *see also Huff v. United States*, Civ. A. No. H-12-3785 & Crim. No. H-02-742, 2015 WL 5252129, at *3 (S.D. Tex. Sept. 8, 2015) (similar analysis); *cf. Gage v. Chappell*, 793 F.3d 1159, 1165 (9th Cir. 2015) ("We acknowledge that Gage's argument for exempting his *Brady* claim from the § 2244(b)(2) requirements has some merit. Under our precedents as they currently stand, prosecutors may have an incentive to refrain from disclosing *Brady* violations related to prisoners who have not yet sought collateral review. *See Lopez*, 577 F.3d at 1064-65. But as a three-judge panel, we are bound to follow [circuit precedent holding claims in which the factual predicate existed at the time of the first habeas petition qualify as second or successive under AEDPA]. *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc)." (citation modified)).

　　While the undersigned believes that Blackman has not passed Section 2244(b)(2) (B)(ii)'s high bar, whether her timely (but nevertheless successive) claim under *Brady* is material, for example, is certainly a closer question. *See Harris v. Thompson*, 698 F.3d 609, 628 (7th Cir. 2012) ("*Smith [v. Cain*, 132 S. Ct. 627 (2012),] shows that impeachment of the inculpatory testimony of the only eyewitness is material to an

accused's defense."); *Dennis v. Wetzel*, 966 F. Supp. 2d 489, 517 (E.D. Pa. 2013) ("When the Commonwealth['s suppression of evidence] denied Dennis the ability to impeach the most important eyewitness in the government's case, it denied him a fair trial."); *cf. Sholes v. Cain*, Civ. A. No. 06-1831, 2008 WL 2346151, at *7 (E.D. La. June 6, 2008) ("Even if Gillard's testimony had been impeached and he was entirely discredited, his testimony was in no way crucial to petitioner's conviction. Gillard did not see the shooting. The only relevance of his testimony is that it placed petitioner in the residence immediately after the shooting; however, that fact was also established through the eyewitness testimony of both Jones and McKay. Accordingly, Gillard's testimony was, at best, merely cumulative."); *Quinones v. Portuondo*, No. 00 Civ.8126PACRLE, 2005 WL 2812234, at *5 (S.D.N.Y. Oct. 21, 2005) ("[T]here is no reasonable possibility that disclosure of the potential impeachment material could have affected [the] verdict, given that a second eyewitness ... provided independent identification testimony. A new trial is generally not required when the testimony of a witness is corroborated by other testimony, or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." (citing *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995)); *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998) ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.").

The case for a successful *Brady* claim here is certainly better than the petitioner's in *Johnson v. Dretke*, in which a panel of the Fifth Circuit held that, "[i]n light of the plain text of AEDPA and our caselaw, we must conclude that a successive petitioner urging a *Brady* claim may not rely solely upon the ultimate merits of the *Brady* claim in order to demonstrate due diligence under § 2244(b)(2)(B) *where* the petitioner was noticed pretrial of the existence of the factual predicate and of the factual predicate's ultimate potential exculpatory relevance." 442 F.3d at 911 (emphasis added).

The undersigned therefore further finds that Blackman's *Brady* and *Giglio/Napue* claims are "adequate to deserve encouragement to proceed further," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), and recommends that the Court grant Blackman a certificate of appealability as to these claims pursuant to 28 U.S.C. § 2253(c), Federal Rule of Appellate Procedure 22(b), and Rule 11 of the Rules Governing Habeas Corpus Cases Under Section 2254.

## Recommendation

The Court should dismiss this successive habeas application for lack of jurisdiction but also grant a certificate of appealability as to the *Brady* claim and the claim under *Giglio/Napue*.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

     DATED: September 20, 2016

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE